UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNELL D. SHREVE,

       Plaintiff,

                                       Case No. 05-72444

v.

AETNA LIFE INSURANCE COMPANY,     JUDGE PAUL D. BORMAN
                                       UNITED STATES DISTRICT COURT

       Defendant.

_____ /


**OPINION AND ORDER DENYING DEFENDANT AETNA INSURANCE AGENCY,
INC.'S MOTION FOR ENTRY OF JUDGMENT**


Presently before the Court is Defendant AETNA Insurance Agency, Inc.'s ("Defendant")

Motion for Entry of Judgment. The Court held a motion hearing on June 14, 2006. Having

considered the parties' briefs, and for the reasons stated below, the Court DENIES Defendant's

Motion for Entry of Judgment.

I.      **FACTS**

Plaintiff Donnell D. Shreve ("Plaintiff")[1], a full-time employee of Sysco Corporation[2]

("Sysco"), was eligible to participate in a long-term disability ("LTD") insurance plan (the

---

    [1] Plaintiff is an individual and resident of Michigan. (Am. Compl. ¶ 1).

    [2] Plaintiff was employed as an Order Selector, which required him to drive a pallet jack
through a warehouse to retrieve items from shelves and load inventory onto pallets for delivery.
(Pl.'s Resp. 4; Def.'s Br. 3).

"Policy") sponsored by Sysco and underwritten by Defendant.[3]  (Pl.'s Resp. 3-4).  Plaintiff was

diagnosed with bilateral plantar fibromatosis[4] in February 2001 by his then-treating physician,

Dr. Jerry Walden.  (Pl.'s Resp. 4).  Plaintiff's diagnosis was confirmed by Dr. Donald Wild ("Dr.

Wild") through an MRI.  (*Id.*).  Plaintiff ceased working on February 18, 2001 because his

condition worsened and began affecting both feet.  (*Id.*).  Dr. Wild noted that Plaintiff was

capable of sedentary employment, but he indicated that the pain in Plaintiff's feet might last

indefinitely and that it was unclear when Plaintiff would be allowed to pursue employment

opportunities.  (Def.'s Br. Ex. A, 6/26/01 Wild APS A 175).   Plaintiff filed a claim with

Defendant for LTD on June 20, 2001.  (Pl.'s Resp. 4).  His claim was approved and payments

began on August 18, 2001.  (*Id.*).

According to the terms of Defendant's LTD policy, a covered employee's claim "must

give proof of the nature and extent of the loss. . . . [and the covered employee] must furnish such

true and correct information as [Defendant] may reasonably request."  (Def.'s Br. Ex. A, LTD

Policy A 533).  The policy also states that Defendant "will have the right and opportunity to

examine and evaluate any person who is the basis of any claim at all reasonable times while the

claim is pending or payable."  (*Id*. at A 534).

The LTD policy addressed how Defendant's benefit entitlement decision-making process

works.

[Defendant] shall have discretionary authority to:

---

[3] Defendant is a Connecticut corporation that does business in Michigan as a disability insurance provider.  (Pl.'s Resp. 4; Am. Answer 2).

[4] Bilateral plantar fibromatosis is a condition of thickened fibrous tissue beneath the soles of the feet.  (Pl.'s Resp. 4).

> determine whether and to what extent employees and beneficiaries
> are entitled to benefits; and
>
> construe any disputed or doubtful terms of this policy.
>
> [Defendant] shall be deemed to have properly exercised such authority unless [it]
> abuses its discretion by acting arbitrarily and capriciously.

(*Id*. at A 520).  Defendant also has the "right and opportunity to examine and evaluate any

person who is the basis of any claim at all reasonable times while the claim is pending or

payable." (*Id*. at A 534).

A covered employee is eligible to receive benefits "[f]rom the date that you first become

disabled and until Monthly Benefits are payable for 24 months."  (Def.'s Br. Ex. A, LTD Policy

A 523).  Defendant's LTD policy states:

> [Y]ou will be deemed to be disabled on any day if:
>
>> you are not able to perform the **material duties** of your **own
>> occupation** solely because of: disease or injury; and
>> your work earnings are 80% or less of your adjusted **pre-disability
>> earnings**.
>
> After the 24 months that any Monthly Benefit is payable, you will be deemed to
> be disabled on any day if you are not able to work at any reasonable occupation
> solely because of: disease; or injury.

(*Id*.) (emphasis in original).  The plan also describes when a covered employee's disability ends.

> Your disability ends on the first to occur of:
>
>> The date [Defendant] finds you are no longer disabled or the date
>> you fail to furnish proof that you are disabled.
>> . . . .
>> The date you are able to perform the duties of a reasonable
>> occupation for compensation or profit equal to 20% or more of the
>> adjusted predisability earnings and you refuse to do so, if such date
>> occurs after the first 24 months that any Monthly Benefit is
>> payable.

(*Id*. at A 524).

In March 2003, Plaintiff's then-treating physician, Dr. Alcala-Saenz submitted an

Attending Physician Statement ("APS") to Defendant.    (Def.'s Br. Ex. A, 3/22/03 Alcala-Saenz

APS A 003).  The APS indicated that Plaintiff had visible palpable masses on the bottom of his

feet that were tender to touch.  (*Id*.).  Dr. Alcala-Saenz indicated that Plaintiff's symptoms were

pain on rest and pain when standing or walking.  (*Id*.).  Dr. Alcala-Saenz opined that the

diagnosis was bilateral plantar fasciitis and noted that he was "house confined."  (*Id*.).  The APS

further indicated that Plaintiff had severe limitation of functional capacity, which meant that he

was incapable of minimal sedentary activity, and because of his constant pain and lack of sleep,

Plaintiff had difficulty concentrating and remembering.  (*Id*.).  Plaintiff's prognosis was marked

as "guarded."  (*Id*.).

At the conclusion of the 24-month disability benefits period, Defendant requested

updated records and asked Plaintiff to submit a Claim Questionnaire ("Questionnaire").  (Def.'s

Br. 5).  Plaintiff's treating physician, Dr. Angelica Francu ("Dr. Francu"), submitted an APS on

April 8, 2004, indicating that Plaintiff had bilateral plantar fasciitis as a primary diagnosis, and

Dupuytren's contractures as a secondary diagnosis.  (Def.'s Br. 6; Def.'s Br. Ex. A, 4/8/04 APS

A 003).   Dr. Francu also noted on the APS that there was no estimated date for Plaintiff to return

to work,[5] and that his condition had regressed.  (*Id*.).  However, Dr. Francu indicated that

---

[5] The Court assumes that "estimated date to return to work" means the estimated date Plaintiff
could resume his previous job responsibilities.  This assumption stems from Dr. Francu noting
the limitation on hours per day and days per week that Plaintiff can work.

Plaintiff could work six hours a day, five days a week, performing sedentary work.[6]  (*Id*.).

Further, Dr. Francu checked "no" to the question, "Is there a medical contraindication for patient

to participate in Vocational Rehabilitation (job training) programs?"  (*Id*.).

Plaintiff completed the Questionnaire on May 4, 2004. (*Id*.).  On the Questionnaire,

Plaintiff claimed that he was unable to walk and stand for extended periods of time, and also

claimed that his feet were a constant source of pain.  (Def.'s Br. Ex. A, Claim Questionnaire A

007).  Plaintiff indicated on the Questionnaire that he is able to take care of personal care needs

(i.e., grooming, dressing, etc.), and does laundry and cleaning on a regular basis.  (*Id*.).

Additionally, Plaintiff's Questionnaire answers indicated that he did not go for walks, though he

goes fishing for fun.  (*Id*.).

Defendant had its consulting medical director, Dr. William Hall ("Dr. Hall"), review

Plaintiff's medical records and APS reports.  After reviewing the medical records and APS

reports, Dr. Hall concluded:

> I am not able to identify clinical references to activities prevented, delayed or
> interrupted by [Plaintiff] because of pain nor am I able to identify references to
> severe or recurring or intractable medication side effects experienced by him.
>
> [Plaintiff] has additional medical diagnoses of sleep apnea without complication
> and corrected by administration of C-PAP, obesity, and essential hypertension
> without complication and treated with administration of beta blocker and ACE-
> inhibitor medications.  None of these diagnoses is attended by a medically
> limiting condition.
>
> In my opinion, [Plaintiff's] diagnosis of chronic and refractory left and right
> plantar faciitis complicated by Dupuytren's contractures at the same sites

---

[6] Sedentary work activity was defined on the APS as "[m]oderate limitation of functional capacity.  Exerting up to 10 pounds of force occasionally.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." (Def.'s Br. Ex. A, Claim Questionnaire A 007).

> constitutes a medically limiting condition preventing sustained standing or walking.
>
> I am not able to identify an objective or absolute impediment to [Plaintiff's] pursing sustained (full-time) activity including work at a sedentary level of exertion.

(Def.'s Br. Ex. A, 1/12/04 Dr. Hall Claim Review Summary A 225).  To assess Plaintiff's vocational capabilities, Defendant referred Plaintiff's claim for a skills analysis/labor market study.  (Def.'s Br. 7).  The skills analysis/labor market study found fifty potential employment opportunities within a fifty mile radius of Plaintiff's residence.  (*Id*. at 8; Labor Market Survey A 185-95).

After reviewing Dr. Hall's summary and the vocational information, Defendant determined that Plaintiff no longer met the definition of disabled, as stated in its LTD policy. (Def.'s Br. Ex. A, Defendant's Notes A 343-49).  Defendant informed Plaintiff by letter, on September 8, 2004, that his benefits would be terminated because he no longer satisfied the Policy's definition of disability, (Def.'s Br. Ex. A, 9/8/04 Letter A 096-101), and followed up the letter with a phone call on September 9, 2004.  (Def.'s Br. Ex. A, Defendant's Notes A 343).

On September 15, 2004, Plaintiff appealed Defendant's decision to terminate his benefits. (Def.'s Br. Ex. A, 9/15/04 Letter from Pl.  A 046).  On the same day, Dr. Francu's office informed Defendant by telephone that Dr. Francu's April 8, 2004 APS form was completed incorrectly.   Dr. Francu also sent a letter to Defendant on September 17, 2004, stating that after reevaluation , including a recent medical examination by Dr. Francu,  Plaintiff remained unable to work.[7]  (Def.'s Br. Ex. A, 9/17/04 Letter from Dr. Francu A 044).  Defendant also received

---

   [7] Dr. Francu's letter also informed Defendant that Plaintiff was admitted into the Emergency Room for uncontrolled hypertension.  It appears that Plaintiff first went to Oakwood Healthcare

Plaintiff's September 16, 2004 emergency room intake sheet, indicating that Plaintiff had

elevated blood pressure but was not experiencing pain at the time.  (Def.'s Br. Ex. A, Emergency

Physician Record A 077-083).  However, prior to being transferred to the hospital, a physician

examining Plaintiff at Oakwood Healthcare Center noted that Plaintiff was unable to stand, walk,

or sit for very long, due to pain in his feet.  (Def.'s Br. Ex. A, Oakwood Healthcare Center Form

A 069).

On November 4, 2004, Defendant informed Plaintiff in a letter that his appeal was

rejected.  (Def.'s Br. Ex. A, 11/4//04 Letter to Pl. A 091).  Defendant's letter stated that although

Dr. Francu informed it on September 17, 2004 that Plaintiff was still unable to sit, stand, or walk

without pain, "[Dr. Francu] did not indicate what specifically happened between April 8, 2004

and September 17, 2004 to change her mind."  (*Id*.).  The letter also mentioned that "[t]here is no

documented change in your condition that would prevent you from performing sedentary work."

(*Id*.).

On December 20, 2004, Dr. Francu again wrote to Defendant.  (Pl.'s Resp. 10).  In that

letter, Dr. Francu indicated that Plaintiff's diagnosis remained the same, Plaintiff had no ability

to work, and she considered him permanently disabled.  (Def.'s Br. Ex. A, 12/20/04 Francu

Letter to Def. A 282).  Plaintiff's benefits remained terminated, resulting in this lawsuit.

## II.    ARGUMENTS

### A.    Defendant's Arguments

Defendant argues that judgment in the matter should be decided based upon the

---

Center, (*See* A 069-071), before being transferred by ambulance to Oakwood Annapolis
Hospital.  (*See* A 077-083).

administrative record.  Defendant claims that the Court must apply the arbitrary and capricious

standard of review, which requires deference to Defendant's decision.  Defendant avers that

Plaintiff is unable to demonstrate any evidence that Defendant's decision was financially

motived and that the alleged conflict of interest does not impact the standard of review.

Defendant asserts that the evidence in the administrative record supports its finding that Plaintiff

is not totally disabled.

>    **B.    Plaintiff's Arguments**

Plaintiff responds that an actual conflict of interest exists because Defendant is the

administrator and payor for the Plan.  Plaintiff argues that Defendant arbitrarily refused to accept

Dr. Francu's explanation for the apparent change in her medical opinion and therefore

Defendant's decision to terminate benefits is based on a selective review of the records.  Plaintiff

contends that Dr. Francu attempted to correct a mistake in her April 2004 APS.  Plaintiff claims

that it was always Dr. Francu's medical opinion that Plaintiff was not able to work.

>    **C.    Defendant's Reply**

Defendant replies that controlling case law does not support a finding that its decision to

terminate benefits was biased.  Defendant contends that even though it disagreed with the past-

September 17, 2004 medical opinion of Dr. Francu, its decision was reasonable and based upon

the evidence available in the record.  Defendant argues that Dr. Francu provided no new

evidence in the form of office notes or records from her subsequent exams to support her

contention that Plaintiff has "no ability to work."

>  **III.    ANALYSIS**

>    **A.    Standard of Review**

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court

held that an administrator's decision to deny benefits must be reviewed *de novo* unless the plan

gives the administrator discretionary authority to determine eligibility for benefits.  When the

plan administrator has discretionary authority to determine eligibility for benefits, "the highly

deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis,*

*Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (internal citation omitted).

However, the arbitrary and capricious standard of review is not "without some teeth."

*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).

> 'Deferential review is not no review,' and 'deference need not be abject.'  [The
> court has] an obligation under ERISA to review the administrative record in order
> to determine whether the plan administrator acted arbitrarily and capriciously in
> making ERISA benefits determinations. This obligation inherently includes some
> review of the quality and quantity of the medical evidence and the opinions on
> both sides of the issues.  Otherwise, courts would be rendered to nothing more
> than rubber stamps for any plan administrator's decision[,] as long as the plan was
> able to find a single piece of evidence – no matter how obscure or untrustworthy –
> to support a denial of a claim for ERISA benefits.

*Id.*  (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).

A plan does not need to use the words "discretionary authority" to constitute a clear grant

of discretion to the plan administrator.  *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir.

1998):

> [District courts should focus on the] "breadth of the administrators' power – their
> authority to determine eligibility for benefits or to construe the terms of the plan.
> While 'magic words' are unnecessary to vest discretion in the plan administrator
> and trigger the arbitrary and capricious standard of review, [the Sixth Circuit] has
> consistently required that a plan contain a clear grant of discretion to the
> administrator to determine benefits or interpret the plan.

*Id.* (internal citations omitted).

A plan administrator's decision will not be deemed arbitrary and capricious so long as "it

is possible to offer a reasoned explanation, based on the evidence, for a particular outcome."

*Davis v. Ky. Finance Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).  The arbitrary and

capricious standard is the least demanding form of judicial review of an administrative action.

*Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2005); *see also Williams v.*

*Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).

> **B.      Discussion**

At the outset, the Court finds that Defendant's Policy gives Defendant discretionary

decision-making authority, and thus the Court should apply the arbitrary and capricious standard

of review.  Although the policy need not use the phrase "discretionary authority," Defendant's

Policy does so.  Defendant's Policy states that it has "discretionary authority to . . . determine

whether and to what extent employees and beneficiaries are entitled to benefits."  (Def.'s Br. Ex.

A, LTD Policy A 520).

Defendant argues that Plaintiff cannot show that its decision was motivated or influenced

by a conflict of interest, aside from the fact that Defendant underwrites the benefits at issue and

makes the decision whether to issue those benefits.  Defendant further argues that it has a

reasoned explanation for its decision to deny Plaintiff's claim and that the Court must uphold

that decision.  Defendant contends that the administrative record supports its decision that

Plaintiff is able to work at a reasonable occupation, despite his injury.

Plaintiff responds that an actual conflict of interest exists, and Defendant's bias in

refusing to consider Dr. Francu's explanation – that she made a mistake on her April 2004 APS

and that Plaintiff is unable to work in any capacity – should be factored into the Court's analysis.

Plaintiff avers that Defendant cannot arbitrarily refuse to credit Plaintiff's reliable evidence,

which, in this case, is the opinion of his treating physician.  Additionally, Plaintiff claims that

Defendant performed a selective review of the records and evidence because Defendant ignored

Dr. Francu's subsequent letters which stated that Plaintiff has no ability to work.  Plaintiff asserts

that Defendant also chose to rely entirely on its file reviewer, who was not an independent

expert, and failed to send Plaintiff for an independent medical examination following the report

of its medical reviewer.  Plaintiff cites *Moon v. Unum Provident Corp*., 405 F.3d 373 (6th Cir.

2005), and *Evans v. Unumprovident Corporation*, 434 F.3d 866 (6th Cir. 2006).

In the instant case, Defendant both funds and administers the plan at issue. Accordingly,

it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the

denial or discontinuation of benefits. Because of this dual role, "the potential for self-interested

decision-making" is an actual conflict.  "[A] conflict of interest exists when the insurer both

decides whether the employee is eligible for benefits and pays those benefits." *Evans,* 434 F.3d

at 876 (internal citation omitted).  When there is a conflict of interest, "the conflict must be

weighed as a factor in determining whether this is an abuse of discretion." *Firestone*, 489 U.S. at

115.  Thus, the Court will consider Defendant's conflict of interest as a factor in its analysis.

In support of its decision to terminate Plaintiff's disability benefits, Defendant mainly

relied on a few of the documents in the record.  Defendant relied on Plaintiff's Questionnaire,

which stated that he could not do extended walking or standing, but was able to take care of his

personal needs, and chores, like laundry and cleaning, and fishing.  Defendant also relied on Dr.

Francu's April 2004 APS, which stated that Plaintiff was capable of sedentary work activity,

with the use of up to 10 pounds of force, for six hours per day, five days per week.  Also noted in

the APS was that Plaintiff could occasionally walk or stand for brief periods of time while at

work.  Dr. Francu's APS was consistent with Dr. Wild's APS, which stated that Plaintiff could

work but needed to sit frequently.[8]  Additionally, Defendant relied heavily on Dr. Hall's review

and summary of Plaintiff's medical records.  Defendant did not rely on Dr. Francu's September

16, 2004 and December 20, 2004 letters, nor her overall medical change of opinion, because it

deemed the letters and the change of opinion as not credible.  Defendant reasoned that Dr.

Francu did not include office examination notes or other medical records to support her most

recent medical opinion, which was contrary to her April APS.

        Plaintiff argues that Defendant's decision was arbitrary and capricious because Dr.

Francu, not Dr. Hall, was best able to determine the severity of Plaintiff's disability.  Further,

Plaintiff argues that Defendant selectively reviewed the records when it dismissed Dr. Francu's

September and December 2004 letters in favor of Dr. Hall's medical review summary, which did

not take into account Dr. Francu's later – and more current – medical evaluation of Plaintiff.

        In *Moon v. Unum Provident Corporation*, the Sixth Circuit held that the termination of

the plaintiff's disability benefits was arbitrary and capricious where the defendant relied solely

on the staff physician's opinion, rather than on the plaintiff's own physicians.  The court held

that "the only medical opinion contrary to [the plaintiff's treating physician] was [the staff

physician].  He arrived at his opinion not upon examination of [the plaintiff], but rather upon . . .

a selective review of the administrative record."  405 F.3d at 381.  Indeed, in a subsequent

decision awarding attorney fees to Moon's attorney, the Sixth Circuit reiterated:

---

   [8] Although Dr. Wild stated that Plaintiff could work but needed to sit frequently, he also felt
that Plaintiff could not pursue employment opportunities at the time his APS was written.

> Without question, UNUM'S wholesale adoption of the opinion of an interested physician, who based his findings on selective information in the administrative record and did not examine Moon, is misconduct that supports our decision to weigh this factor against UNUM.

*Moon v. UNUM Provident Corp.*, Case No. 05-1974, slip op. at 6 (6th Cir. Jun. 29, 2006).

In *Evans v. Unumprovident Corp.*,[9] the court found that the plan administrator's decision to have the plaintiff's file reviewed, rather than conducting a physical exam, was another factor to consider in the assessment of whether the defendant acted in an arbitrary and capricious manner.  434 F.3d at 877.  The court also opined that the failure to conduct a physical examination, especially when the defendant explicitly reserves the right to do so, possibly raises questions of thoroughness and accuracy in the determination of benefits.  *Id.*  The court held that:

> Defendant's reliance solely on file reviews by its in-house physicians is questionable in light of the critical credibility determination is made in those file reviews, the factual inaccuracies contained therein regarding plaintiff's treatment history, and the fact that the file reviews categorically dismissed the reliable opinion of plaintiff's treating physicians that the stress factor militated against plaintiff's resumption of her administrative position.

*Id.* at 880.

Here, Plaintiff's treating physician originally stated that Plaintiff could work six hours a day, five days a week.  After Defendant terminated the benefits, treating physician again examined Plaintiff and submitted letters to Defendant notifying them that, after reevaluating Plaintiff, he was not able to work.  Dr. Francu's subsequent letter notifying Defendant of her reevaluation stated that her earlier opinion was a mistake.  This, while Dr. Hall agreed with Dr. Francu's original medical opinion in her April 2004 APS, that initial opinion was changed after a

---

[9] The Court is well aware of the different titling of identical defendants in the above mentioned Sixth Circuit published decisions.  The Court follows the Sixth Circuit titling as contained in the official F.3d reports.

subsequent visit.  Dr. Francu did not submit office examination notes or other medical records to

support her September 16, 2004 medical opinion.  Neither Dr. Hall, nor any other doctor hired

by Defendant ever conducted an examination of Plaintiff.

It is unclear whether Dr. Hall is an independent medical reviewer or somehow affiliated

with Defendant.  It is clear that Defendant did not conduct an independent medical evaluation

after Dr. Francu informed it of her mistake/change of opinion; Defendant had reserved the right

to do so.  Although Dr. Francu never submitted office examination notes or other medical

records to document the change in her medical opinion of Plaintiff, the fact remains that she

performed another medical evaluation on Plaintiff on September 16, 2004.  It was her opinion, as

of that date, that Plaintiff had no ability to work, walk, sit or stand.  Dr. Francu believed that

Plaintiff's plantar fasciitis prognosis was poor and that he continued to regress.  Regardless of

whether Dr. Francu submitted notes or records to document her medical evaluation, Defendant

was aware of the reevaluation and of Dr. Francu's medical opinion of Plaintiff, and that her

change of opinion was based on the new evaluation.  If Defendant believed that Dr. Francu's

medical opinion was unsupported because she did not specifically state what occurred to change

her mind, it should have conducted its own independent medical evaluation, rather than ignoring

her medical opinion and subsequently denying Plaintiff's appeal.  This circuit has previously

held that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable

evidence, including the *opinions* of a treating physician." *Black & Decker Disability Plan v.

Nord*, 538 U.S. 822, 834 (2003) (emphasis added).  Here, instead of relying on Dr. Francu's most

recent medical opinion, Defendant relied on its consulting medical director's opinion,[10] even in

light of both Dr. Francu's statement that her April 2004 APS was made in error, and, Dr.

Francu's medical opinion based on her September 16, 2004 evaluation of Plaintiff.

Accordingly, after considering Dr. Francu's September 16, 2004 medical opinion of

Plaintiff, Defendant's decision not to perform an independent medical evaluation, and

Defendant's conflict of interest, the Court concludes that Defendant acted arbitrary and

capriciously in terminating Plaintiff's disability benefits.

## III.   CONCLUSION

For the reasons stated, the Court DENIES Defendant's Motion for Entry of Judgment.

Give this decision, the Court will permit Plaintiff to re-file its out-of-time Motion for Summary

Judgment within two weeks from the date of this opinion, and thereafter permit Defendant to file

a Response.

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 12, 2006

---

[10] The Court notes that Dr. Hall suggested in his summary that Defendant request Plaintiff's medical records and an APS on April 1, 2005.  Defendant rejected Plaintiff's appeal before April 1, 2005, and never requested the additional information.

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July 12, 2006.

s/Denise Goodine
Case Manager